FISHER, by next friend, v. ST. LOUIS TRANSIT COMPANY, Appellant.

Division Two, July 3, 1906.

1. **PLEADING: General Damages: Mingling of Causes: Demurrer to Evidence.** Even though several different causes of action be united in the same count of the petition, that is no ground for refusing to allow the introduction of evidence under it. Nor does it make any difference that there was united in the one count matter that does not constitute a cause of action with facts and allegations that do, for if they be divisible a

demurrer to the introduction of evidence would only be avail-able as to the matter which fails to constitute a cause of action. It is only when a petition fails to state a cause of action that an objection to the introduction of evidence under it can be successfully interposed.

2. ———: ———: ———: ———: Trespass and Infection: Prac-tice. Plaintiff charged in one count that he was kicked off of a street car by the conductor and greatly and permanently injured, and that he was "placed in a hospital on account of said injuries and while in said hospital and by reason of con-tact with others infected with diphtheria, he contracted diph-theria and suffered great pain and anguish therefrom; that by reason of all said injuries he was permanently injured and damaged in the sum of $20,000," for which he asks judgment. *Held*, that an objection to the introduction of evidence under this petition, made when plaintiff called his first witness, on the ground that it alleges no specific amount of damages for the trespass, and no specific amount for the infection for which defendant was not liable, was properly overruled. The allega-tion in reference to the diphtheria might have been stricken out upon motion, or reached by special demurrer, but not by general objection to the introduction of evidence under the petition which states a cause of action.

3. INSTRUCTION: "Injuries Complained of." The jury should not be left to form their own conclusions as to the "injuries complained of." The instructions should tell them what are the issuable damages. Especially is such an instruction errone-ous when the petition embraces injuries for which defendant cannot be held liable.

4. ———: Too Broad. Where an instruction asked by plaintiff, when given a fair and reasonable construction, is not subject to the criticism that it embraces an item of damages not legal-ly allowable, the defendant should ask an instruction limiting the recovery of damages allowable, or failing to do so, he should not be heard to complain on appeal.

5. ———: No Evidence. Where there was no evidence upon which to predicate an instruction as asked, there is no error either in refusing it or in modifying it and then giving it.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Blevins*, Judge.

REVERSED AND REMANDED.

*Boyle & Priest, J. W. Jamison* and *Crawley & Gose* for appellant.

(1)    The requirements of the Code, section 592, that a plaintiff's petition shall contain a plain and concise statement of the facts constituting his cause of action, does not affect the fundamental requirements of good pleading, but only the form of such pleading. Sidway v. Stock Co., 163 Mo. 372; Ruebsam v. Railroad, 108 Mo. App. 437. When the supposed defect is called to the attention of the trial court in an objection to the introduction of any evidence. under the petition, the rule that a pleading is to be construed most strongly against the pleader will be applied in the appellate court. Vivian v. Robertson, 176 Mo. 219. The objection that the cause of action is defective is never waived, nor is it cured by verdict or judgment. Jordan v. Railroad, 61 Mo. 53; State v. Hoyt, 123 Mo. 348; Smith v. Burns, 106 Mo. 94; Munchow v. Munchow, 96 Mo. App. 593; Walker v. Point Pleasant, 49 Mo. App. 244. Where the cause of action is defective, oral objection to any evidence is sufficient. Syme v. Steamboat, 28 Mo. 335; Hallan v. Randall, 48 Mo. App. 203. Every substantial fact which plaintiff in order to recover must prove, he must also allege so that an issue may be made thereon. Sidway v. Stock Co., 163 Mo. 342. The omission of an essential averment is not cured by verdict. Staley v. Wallace, 21 Mo. App. 128; Story v. Insurance Co., 61 Mo. App. 534. If a recovery of money be demanded, the amount thereof shall be stated, or such facts as will enable the defendant and the court to ascertain the amount demanded. R. S. 1899, sec. 592. In an action at law the plaintiff is limited to the damages which he claims in his petition and which must be stated at a definite sum. Coles v. Foley, 13 Mo. App. 249; Horton v. Railroad, 83 Mo. 541; Carter v. Shotwell, 42 Mo. App. 663. The damages awarded cannot exceed the amount claimed in the petition. Carter v.

Shotwell, 42 Mo. App. 663; Horton v. Railroad, 83 Mo. 541; Smith v. Royce, 165 Mo. 654. A verdict for a fixed sum cannot be sustained where there is nothing in the petition showing definitely the amounts of plaintiff's claim. Carter v. Shotwell, 42 Mo. App. 663; Hyatt v. Legal Ass'n, 106 Mo. App. 610. In the plaintiff's pleading in this suit, no damages are claimed; and if any issue properly triable in this court should be here joined on such pleading and the jury should render a verdict for plaintiff and give him damages, those damages could not be legally collected, because no damages are claimed in the pleading. Brownson v. Wallace, 4 Blatchf. (U. S.) 467; Sidway v. Stock Co., 163 Mo. 372; Chem. Wks. v. Nemnich, 169 Mo. 397. (2) When a petition alleges damages as resulting from defendant's act, but the evidence discloses that the damages were caused in part by something for which defendant was not responsible, then a judgment can only include that part of the damages resulting from defendant's act alone. Durgin v. Neale, 82 Cal. 595; Buddington v. Shearer, 20 Pick. (Mass.) 477; Russell v. Tomlinson, 2 Conn. 206. There might be some difficulty in ascertaining the quantum of damage done by the one and that by the other, but whatever the difficulty might be, it could be no reason why the party liable for the one should be held for the other. Buddington v. Shearer, 20 Pick. (Mass.) 477; Russell v. Tomlinson, 2 Conn. 206. When the damages caused by one are increased by the intervention of an independent cause, the author of the first is responsible for the damage caused by his own wrong if separable from those produced by the intervening cause. Railroad v. Meech, 163 Ill. 314. If the injury may have resulted from either of two causes, for one of which, and not for the other, defendant is liable, plaintiff must show, with reasonable certainty, that the result was produced by that cause for which defendant is responsible, and if the evidence leaves this to conjecture, the plaintiff fails. Smart v.

Kansas City, 91 Mo. App. 586., Where an effect has been produced by two independent causes and it cannot be determined whether, without the happening of both, the effect would have been produced at all, and a particular party is responsible for the consequences of one of such causes, in such case no recovery can be had, because it cannot be judicially determined that the effect would have been produced without the effect of both. Railroad v. Renney, 42 Md, 136; Houston v. Traphagen, 47 N. J. L. 23. (3) As the trial issues must be within the paper issues, instructions must be framed with regard to the paper issues. Whipple v. B. & L. Assn., 55 Mo. App. 554. It is error for the court by instructions to change the issues made by the pleadings. Wright v. Fonda, 44 Mo. App. 634; State v. Kaufman, 51 Mo. App. 252. An instruction which refers the jury to the pleadings to find the issues is erroneous. Shaw v. Dairy Co., 56 Mo. App. 521; Railroad v. McGrew, 104 Mo. 282; Dassler v. Wisley, 32 Mo. 498. It is not only the office of instructions to inform the jury as to the law of the issues raised, but where the evidence is such that false issues might easily be raised, the court ought to guard against such an issue by appropriate instructions. Estes v. Shoe Co., 155 Mo. 577; Budd v. Hoffheimer, 52 Mo. 297; Fry v. Estes, 52 Mo. App. 1; McAtee v. Vanlandingham, 75 Mo. App. 45; Mansur v. Botts, 80 Mo. 651; Little v. Macadoras, 29 Mo. App. 332; Matthews v. Railroad, 26 Mo. App. 75; Morgan v. Rice, 35 Mo. App. 591.

*Cocke & Trigg* and *C. D. Francis* for respondent.

(1) (a) A petition is not subject to attack by general demurrer, because, perchance, in addition to items of injury upon which a recovery may be had, it also sets up other items upon which no liablity of the defendant can be predicated. Only by special demurrer, or a motion to strike out, can such latter items be as-

sailed. The defendant who neglects to avail himself of the remedies last mentioned may still fully protect himself by an objection to the introduction of any evidence upon the items for which he is not liable. 6 Ency. Pl. and Pr. 301-4; Robrecht v. Marlin, 29 W. Va. 765; Leland v. Tousey, 6 Hill (N. Y.) 336; Railroad v. Hardin, 107 Ga. 379; Packard v. Slack, 32 Vt. 9; Hayden v. Sample, 10 Mo. 215; Ancell v. Cape Girardeau, 48 Mo. 80; Justice v. Lancaster, 20 Mo. App. 559; Railroad v. McLiney, 32 Mo. App. 166. (b) *A fortiori,* a demurrer of the evidence, on the ground that the petition states no cause of action, will not be sustained in such a case. Roberts v. Walker, 82 Mo. 200. (c) The practice of delaying attack upon a pleading till the trial of the cause has been repeatedly condemned by the appellate courts of this State, and only where the complainant, by a liberal construction, fails wholly to set out any cause of action whatever, will a demurrer to the evidence be sustained. Haseltine v. Smith, 155 Mo. 404; Spalding v. Nesbit, 104 Mo. App. 447; Duerst v. Stamping Co., 163 Mo. 607. (d) It is not requisite, in the enumeration of the various items of injury suffered by a complainant, that his petition should specify the sum demanded as damages for each separate item; an *ad damnum* clause, naming a sum in the aggregate, being all that is required. A failure, therefore, to separately aver the measure of recovery demanded for each item will not expose the petition to the objection that it states no cause of action. Montgomery v. Locke, 11 Pac. 74; Sedberry v. Verplanck, 37 S. W. 242; Helbrandt v. Donaldson, 69 Mo. App. 92. (e) It constitutes no valid objection to a complainant's right to recover such damages as his evidence shows he has suffered, that his petition alleges injuries which the evidence does not support. Cole v. Sprowl, 35 Me. 161; Ankrum v. Marshalltown, 105 Ia. 493. Where, therefore, a petition alleges several injuries to have been received through the tortuous acts of defendant; naming a gross sum as the

measure of damage; and the evidence tends only to establish a portion of the injuries; plaintiff is, nevertheless, entitled to have his case go to the jury, and the latter may find for him any amount as the adequate compensation for his loss, within the amount claimed. Walsh v. Dolan, 15 N. Y. Supp. 96. (2) (a) No error can be predicated upon the mere presence in the petition of the allegations relating to the diphtheria which plaintiff contracted whilst at the hospital. This item of alleged injury having been wholly abandoned by plaintiff at the trial—he having introduced no evidence on the subject, nor carried the same into the instructions—it was not one of the issues which went to the jury. Musser v. Hill, 17 Mo. App. 171; Powell v. Bosard, 79 Mo. App. 627; Thomas v. Herrall, 18 Or. 546; Muth v. Railroad, 87 Mo. App. 433; Kingsburry v. Railroad, 156 Mo. 379; Mirrielees v. Railroad, 163 Mo. 491; Grady v. Railroad, 102 Mo. App. 215. (b) Appellant will not be heard to object that evidence of the diptheria was given at the trial, when the same was only drawn out by it on cross-examination. *Volenti non fit injuria.* Carpenter v. Wilmot, 24 Mo. App. 589; Fullerton v. Railroad, 84 Mo. App. 498. Nor will appellant be heard to complain of its failure to offer an instruction negativing a recovery upon the item of diphtheria thus placed in evidence by it. Taylor v. Iron Co., 133 Mo. 364; Geismann v. Electric Co., 173 Mo. 679; Logan v. Weltmer, 180 Mo. 335. (3) (a) The criticism that instructions 1 and 3 referred the jury to the petition is unmerited. Such objection only lies when the jury are referred to the pleadings to ascertain the issues. The various items of injury enumerated in the petition were not issues in said two instructions. The employment therein of the words "injuries complained of" was purely descriptive, and for the purpose of shortening the instruction — a permissible practice, and in no wise intrenching upon the rule that the jury are not to be referred to the pleadings for the issues involved.

Edlemann v. Transfer Co., 3 Mo. App. 503; Britton v.
St. Louis, 120 Mo. 444; Sherwood v. Railroad, 132 Mo.
343; Allen v. Springfield, 61 Mo. App. 270; Lackland
v. Railroad, 101 Mo. App. 428. (b) Furthermore, in-
struction 8—the only one wherein the several items of
injury were issuable facts—makes no such reference,
but, on the other hand, specially enumerates the sever-
al items which the jury may properly consider in
awarding damages. This consideration would, of itself,
be sufficient to dispose of the objection. Brown v. Rail-
road, 104 Mo. App. 691. Instructions are to be read to-
gether as an entirety, and their meaning collected from
the whole context; not from detached instructions, or
phrases in them. Albergber v. White, 117 Mo. 362;
Fearey v. O'Neill, 149 Mo. 474; McGrew v. Railroad,
109 Mo. 591; Shortel v. St. Joseph, 104 Mo. 114. (4)
The court properly refused appellant's instruction 11,
which stated to the jury that if they were unable to de-
termine whether plaintiff fell from defendant's car or
was kicked therefrom, then their verdict would be for
defendant; and for the following reasons: (a) There
was not a scintilla of evidence of any character tending
to show that plaintiff's fall resulted from any thing
other than a kick by one of appellant's conductors.
Rodney v. McLaughlin, 97 Mo. 426; Sparks v. Transfer
Co., 104 Mo. 531; Wilkerson v. Eilers, 114 Mo. 245;
Skyles v. Bollman, 85 Mo. 35; Franz v. Hilterbrand,
45 Mo. 121. (b) And for the same reasons the court
properly struck out the latter paragraph of defend-
ant's instruction 5. Gerhauser v. Ins. Co., 7 Nev. 193.

BURGESS, P. J.—This is an action by plaintiff,
Floyd Fisher, a minor, who sues by his next friend,
W. H. Cocke, against the defendant St. Louis Transit
Company, for twenty thousand dollars damages for
personal injuries alleged to have been sustained by him
by reason of the wanton and malicious conduct of the

servants and employees of defendant. Plaintiff's petition, omitting the formal parts, is as follows:

"Plaintiff, by his next friend, states that he is an infant under the age of fourteen years and resident of the city of St. Louis and State of Missouri; that W. H. Cocke has been duly appointed by this court next friend for the purpose of instituting and prosecuting this action; that the defendant is a street railway corporation duly organized under the laws of the State of Missouri, and authorized to conduct a street railway business in the said city of St. Louis; that on or about the 9th day of January, 1902, the defendant owned and operated cars on Olive street in the said city under the charge of conductors, for the purpose of carrying passengers for hire; that between six and seven o'clock p. m. on or about the 9th day of January, 1902, plaintiff stood on the steps of a car so owned and operated by the defendant while the said car was moving east on the said Olive street between Twentieth and Nineteenth streets in the said city; that then and there defendant, acting through its duly authorized servant, the conductor in charge of said car, did unlawfully strike plaintiff, and wantonly, forcibly, willfully and maliciously kicked, shoved and knocked plaintiff from the said moving car and thereby caused him to be thrown with great violence against and upon the granite paved street, and thereby his head and body were caused to strike with great violence against said granite paved street, whereby his head and body were cut, bruised and injured; that by reason of the said injuries to plaintiff's head and body, his nervous system, brain and muscles have been seriously affected and he has lost all use and control over his limbs and is losing his power of speech and eyesight and has been confined to his bed since the said injury occurred; that the said injuries are permanent and that plaintiff is permanently disabled from work or exercise of any kind and is rendered an invalid for the rest of his life; that plaintiff has been placed

in a hospital on account of said injuries and while in said hospital and by reason of contact therein with others infected with diptheria, he has contracted diptheria and has suffered great pain and anguish therefrom; that by reason of all of said injuries and sickness he has suffered great bodily and mental pain and anguish and has been permanently injured and damaged in the sum of twenty thousand dollars.

"Wherefore, plaintiff prays judgment for the sum of twenty thousand dollars and the costs of this suit."

The answer is a general denial.

The trial, before the court and jury, resulted in a verdict in favor of plaintiff for the sum of $11,000, which was thereafter reduced to $7,500, for which judgment was rendered.

Within four days after judgment was rendered, defendant filed a motion for a new trial, which was overruled, and defendant appealed.

After the jury was sworn, and before any evidence was introduced, defendant objected to the introduction of any evidence, under the petition, for the following reasons:

"First. Because the petition shows on its face that the supposed injuries and damages sued for consist in part of pain, suffering and impairment of health resulting from diphtheria, for which the petition shows that the defendant is in nowise responsible, without stating any fact from which this court or a jury can determine what part of the $20,000 damages sued for are referable to the alleged fall from the car, or what part of said $20,000 damages is intended by the pleader to apply to such of the alleged injuries as resulted from said alleged fall.

"Second. Because it affirmatively appears from the petition that the damages sued for embrace alleged injuries for which defendant is not responsible, and that the alleged pain and suffering therefrom are so blended with the alleged pain and suffering resulting

from the supposed injuries caused from the alleged fall from the car that it is impossible under the petition for either the court or a jury to separate or distinguish between them so as to determine how much of the $20,000 damages sued for is claimed as compensation for the particular injuries, if any, resulting from the alleged fall from the car.''

The objections were overruled, and the defendant excepted.

Plaintiff's evidence was to the following effect:

On the 9th day of January, 1902, Mrs. Matilda Troutman kept a rooming house at 1814 Olive street. At this rooming house there lived also Lee Allen, her son, and Floyd Fisher and his parents. Floyd Fisher, at this time, was eleven years old, and, according to his statement, on that day he went down to the corner of Twentieth and Olive streets to look for his brother. He concluded to steal a ride on the Transit Company's car and climbed on the second step on the north side of the rear platform of an east-bound car, holding to an iron gate which closed the north end of said platform. There was no one on the platform except the conductor, who was standing at the south side. Nothing was said or done until the car reached about the middle of the block, between Nineteenth and Twentieth streets, going at full speed, when the conductor, without a word, walked over and kicked plaintiff off of the car. Plaintiff landed on his head on the pavement between the two tracks. While he lay there no one came to his assistance, no wagon passed, nor did he see any one around there. He got up and went home by himself and his father took him to the doctor, who dressed a scalp wound of about two inches in length on the top of his head. No other injury was found by the doctor or complained of by the plaintiff. Plaintiff returned home and in from one to four days thereafter returned to school. He remained in school for two or three weeks and then went home and went to bed, being ner-

vous and fidgety.   These symptoms disappeared in
about a week, but plaintiff was still sick and staggered
when he attempted to walk.   He was taken to the hos-
pital and remained there some two or three months,
after which he returned home, being still sick.   At the
time of the trial he was very much better, but not, as
he expressed it, "clear well."

Plaintiff was sworn as a witness in his own behalf,
and testified that Mr. Allen was in the room with his
father and mother after he returned from the doctor's,
but that Mr. Allen said nothing about having seen him
kicked off the car that evening.   The first time he had
ever heard of it was after he moved to 1609 Olive street,
which was about four months after the time of the in-
jury and about the time the suit was instituted.   He
never saw this conductor before or after the time of the
accident.   When asked what kind of a looking man the
conductor was, he said: "He was a kind of a short man
with sandy mustache."   He saw he had on a cap and
a badge, but did not remember the number of the badge
nor the number of the car.   When twenty-four conduc-
tors of the Olive street line, who passed the point at
which the accident is alleged to have occured, between
the hours of six and seven p. m., were placed in line be-
fore the plaintiff, in order that he might identify the
one who had kicked him off, he could identify no one,
but said: "There ain't no sandy mustache one there,"
but that H. Zeip, 145, "looks more like him than any of
them."

He testified that he had never jumped on the car
that way before and that he did not remember of his
father threatening to whip him for jumping on and off
those cars.   There was a big red spot, but there was
no blood nor cut on his legs where the conductor kicked
him, nor had he said anything to the doctor at the time
about being kicked upon the legs.

Lee Allen, a witness who claimed to have seen a
boy kicked off of a car on the 9th or 10th of January,

but couldn't say positively that it was Floyd Fisher, and who did not say anything to the plaintiff about having seen him kicked off until months afterwards and about the time the suit was brought, testified that he was going, as was his custom, to a cigar store, between Nineteenth and Twentieth streets about 6:30 in the evening. It was dark, but there was a light at Nineteenth and one at Twentieth on Olive street. He testified that when the car was sixty or eighty feet east of Twentieth and Olive, he saw some boy kicked off of the car. He saw that the man who kicked him off had a conductor's cap on and dressed in the uniform of the Transit Co. When the car passed he could not distinguish the number of the car, but he saw the brass buttons on the conductor's coat, and saw the boy alight on his head and afterwards saw him arise, but did not go to assist him or make any inquiries of him. He denied that he had told his mother that he carried the boy into the house, and denied avoiding the company's agent when he endeavored to interview him. He denied being in the room that evening after the injury in company with Floyd Fisher, his father and mother.

Both George Fisher, the father, and the plaintiff testified that the plaintiff had diptheria while in the hospital, and that plaintiff had trouble with his speech and could not talk right. Plaintiff's father testified that the boy returned to school in from one to three days after he was injured and remained in school about two weeks when he came home and went to bed, got nervous, tore his clothes off and swore and talked vulgar, which condition lasted about two weeks, when his inability to walk developed.

Dr. Young testified that the only injury he found when the plaintiff was brought to him on the night of the injury was an ordinary scalp wound, and when asked what symptoms plaintiff showed when called three or four weeks later to examine him, said: "Well,

he just laid there in bed, and he couldn't get up. I couldn't see that he was sick at all, only he said that he was sick."

He further testified that the boy did not rave or anything of that kind, but acted foolish.

Fred Fisher, the plaintiff's brother, testified that he was at home when his brother left and saw him go off and he couldn't explain why it was Floyd went to look for him when he was already at home.

Matilda Troutman, the mother of Allen, said that three or four weeks after the injury, when the boy came home from school, she saw him "dozens of times a day" and he was very nervous.

"Q. I will get you to state what you saw him do —what was his condition during that sickness? A. He was very nervous. He didn't seem to know anybody nor have any mind at all. If you would hand him anything he would throw it at you; and he was on a covered couch, and he would go back and forth from one end of the couch to the other, and pull his clothing off until he was entirely naked, and he wouldn't get off the couch; he would go back and forth; he would imagine there was something under the couch; he said the devil was under the couch.

"Q. What sort of language did he use? A. Very bad, every word was an oath."

She denied that she ever told Mrs. Slough that her son Allen picked Floyd up and carried him home; that when Mr. Slough came two or three times to see her son she told him her son was in Keokuk, Iowa, and she could not give him the address when he asked for it. She may have told him at one time that he was at a different place, but that she did not make any false statement to him in reference to her son.

Dr. Given Campbell, Jr., after describing the symptoms of plaintiff, denominated his condition as traumatic neurosis. He said that traumatic neurosis was a condition following injuries, in which the symp-

toms resembling hysteria or neurasthenia, or those of hypochondria, could all be present, and that in most cases there was a mixture of all these symptoms, but that in this particular case the symptoms were almost entirely hysterical; that the symptoms developed about three or four weeks after the accident were those of a typical attack of hysteria.

The doctor also testified that every symptom shown by the plaintiff might be exhibited by a person who had never been the recipient of any external violence. He was asked the following questions, and gave the following answers: .

"Q. What is the meaning of the word trauma? A. Having to do with a wound or injury.

"Q. And what is the meaning of the word neurosis? A. Neurosis means a change in the nervous system of the individual that produces symptoms, but in which on examination of the nerve organs after death, at an autopsy for instance, no physical signs would be found. The nervous system acts wrong, but you cannot find anything wrong in the nervous system that accounts for that action, the supposition being that there are changes too minute for the present observation to discover.

."Q. What is the usual cause for the disease known as traumatic neurosis? A. It is a disease that is usually produced by a slight injury—falling considerably —giving a psychic shock, a psychic shock to the mind.

"Q. Psychic shock? A. A considerable psychic shock to the mind, and the injury producing it is very frequently traumatic injury—is very frequently one accompanied by concussion, but not necessarily always so.

"Q. Doctor, could the blow that a boy would receive from falling from a car, striking the back of the head on a pavement, cutting a wound about an inch or two inches in length, a scalp wound, produce this concussion known as traumatic neurosis? A. Under the

circumstances, considering the psychical shock, it probably could.

"Q. How is traumatic neurosis usually produced, doctor? A. By a very much similar injury to this. By a condition where the individual is somewhat frightened, as, for instance, by a railroad wreck where there has been a collision, and the death fear being worse than the hurt, and along with that fright the individual is slightly, or more or less slightly, injured physically.

"Q. Now, doctor, is the condition known as traumatic neurosis a permanent injury? A. That is a difficult question to answer absolutely. . . .

"Q. Now, I will ask you again in regard to the permanency of the disease known as traumatic neurosis. I don't believe you answered that question? A. No, sir. The permanency of the disease would, in my opinion, depend upon a good many elements. In all cases the disease would probably run a course of a number of months; in most cases a number of years; and in many cases would impair an individual through the rest of his lifetime.

"Q. How would it impair him through the rest of his lifetime? A. Render him more nervous and excitable, more readily upset by slight shock, by strain — by the strains of everyday life.

"Q. State it in as few words as possible, in a general way. If you can cover the whole field in one general answer, that will serve the purpose. A. A hysteria can affect the individual either by causing a paralysis in any part of the body—one arm, one leg, or both legs, and thereby prevent the patient for a greater or shorter length of time from using that limb. It can produce a contracture in any limb, a drawing up of the joint, which will be more or less permanent, even lasting for months or years. It can produce various mental disturbances, such as the patient was described as suffering from when he was first taken sick a few weeks

198 Sup—37

after the injury. It can produce general spasms, drawing up of the hands; and a hysterical attack is quite often accompanied by laughing, crying, by the sensation of a ball coming up in the throat, and can produce a great many symptoms. In addition to that, it produces what we call the hysterical temperament—that is, the individual is morbidly sensitive; especially courting of admiration, of attention, likes to be noticed—lacking in mental balance generally, and presents a general picture that is fairly well recognized as a hysterical person.

"Q. Doctor, could the condition of traumatic neurosis be produced in a child by reason of such an injury without predisposition to that condition? A. Yes, it could."

Upon cross-examination the doctor said that when the plaintiff was brought to him for examination, he advised that his mind be kept as much as possible off his injuries. That he should be encouraged to handle himself as much as possible and that all attentions that would tend to focus his attention on his disease be avoided.

"Q. Now, this disease, the condition which you found there, I believe you term it traumatic neurosis— trauma, I understand you to say, is an injury? A. Yes, sir.

"Q. That means some physical injury? A. Well, not in the sense in which neurologists often use the word. He can frequently speak of a disease being due to psychic trauma. Of course, it is perhaps not an exact use of the word as far as the etymology is concerned, but as one for neurological custom, I think, makes it fairly correct. Any injury to the mind by some violence done to it like a psychic shock is often spoken of as psychic trauma.

"Q. In other words, there may be hysteria without any physical injury at all to the body? A. Yes, sir.

"Q. But often in psychic injury, other injury as you define? A. In certain individuals.

"Q. Now, doctor, does traumatic neurosis arise or occur except in cases where there are physical injuries? A. Yes, sir, cases have been known of it.

"Q. Cases like that are known to surgery where there has been no physical injury or no psychic shock? A. No, sir.

"Q. Now, doctor, can you distinguish any difference between hysteria due to trauma or hysteria not due to trauma or some other cause? A. In other hysteria, no, sir; but in traumatic neurosis where other conditions are mixed with hysteria I think differentiation can be made.

"Q. Now, it is not a fact that most hysteria is due to causes other than trauma? A. Yes, sir.

"Q. Now, what is the difference between traumatic neurosis and hysteria pure and simple—what other elements enter into the one that are not embraced in the other? A. It is, as I stated on direct examination, namely, that in hysteria there is usually a number of symptoms, all of which are known as hysterical symptoms. In traumatic neurosis we usually have a mixture of hysterical symptoms with other symptoms, principally neurasthenic and sometimes hypochondriac.

"Q. Now, do you ever have the mixture except in trauma? A. Yes, sir; you sometimes do; not so frequent.

"Q. Now, doctor, you saw the plaintiff on the stand when he testified here? A. Yes, sir.

"Q. From his manner upon the witness stand, and the manner in which he testified, would you say that that stammering has disappeared or no? A. Yes, sir; it has entirely disappeared I would say.

"Q. Now, the boy is very much improved since you first saw him, is he not? A. Very much.

"Q. As a matter of fact, this boy is rapidly recov-

ering, is he not, in your opinion? A. He is recovering from the symptoms which he suffered. As to how much nervous substratum there may be remaining is difficult to say.

"Q. If I understood you correctly, you found when you made the examination no injury to the nerve centers, or nerve trunks, as you called them, found no injury at all to them? A. No, sir; none whatever. . . .

"Q. Now, what would be your prognosis with respect to the plaintiff in this case as to the probability of ultimate recovery? A. This particular case?

"Q. Yes, sir; considering the improvement that has been made, the age of the boy; considering his physical condition that you ascertained, and assuming that he will be well treated, or properly treated, and that your suggestions continue to be followed out in the treatment of the boy? A. To form that opinion it would be necessary to estimate the extent to which the hysteria had influenced the purely psychical side of his nature. In proportion as the psychical side had been attacked in that proportion the hysteria superinduced by the injury would be liable to continue and would remain more or less innate in him. The psychic side was evidently very much injured in that first attack. The psychic element largely predominated.

"Q. You mean by that purely his hysterical condition? A. The hysteria affected the mind itself during that time; and judging from that, although it is a difficult question to speak positively on, I would only speak as to probabilities, I would say that there would be a very reasonable probability that he would remain a more excitable individual during a large part of his life than he would be without that injury. He would be more apt to develop hysterical symptoms upon a subsequent slighter shock and injury than he would have been if he hadn't received this injury.

"Q. Is there any way to determine positively

whether or not that will be the case? A. No, there is not; it is a question of opinion.

"Q. Now, this hysteria that you speak of, that affects the mind, does it not entirely—a mental disease, what they call a mental disease? A. Well, through the mind it affects various parts of the individual. It will affect the individual so an arm will draw up and be perfectly useless as if he was paralyzed by a stroke of paralysis, and often remains that way for a number of months or years. That will often be the only disease produced by the mind. It gives all the symptoms of a bodily disease.

"Q. As a matter of fact, this hysteria is considered by medical authorities as primarily a mental disease? A. Yes, sir.

"Q. Where a case of hysteria manifests itself that means a mental disease, purely a case of hysteria, in the absence of any physical or any psychic shock—assuming you have a case of that kind that means a diseased mental condition, does it not? A. Yes, sir; but not entirely in the same sense when one speaks of insanity and mental alienation. Probably it is the disease that affects the centers of the mind below those of pure ideation—below those that have to do with the formation of ideas themselves. It is really very complex in attempting to differentiate just what one does mean by hysteria.

"Q. In a case of pure hysteria, if I understand you correctly, the proper treatment of that is a suggestive treatment? A. Yes, sir.

"Q. To take the mind away from imaginary indisposition under which the party is laboring? A. They are imaginary in a way, and, at the same time, real to the patient.

"Q. As a matter of fact, they are imaginary to the surgeon who treats them? A. They are imaginary in that no changes can be found in the brain that accounts

for them, but they are not imaginary in the sense of being in any way under the individual's control.

"Q. I understand, while they are not under his control, he imagines he is not able to move an arm or limb, still that is due primarily to the mental condition? A. Probably; and whether there is any basis for that organic condition, in our modern methods of investigating the brain to discover, we do not know.

"Q. Now, I understand you to say, to make a suggestion here of various other conditions that may follow a mental improvement of that kind, may affect the man in various ways, in different ways, and you cannot say, nor no other surgeon, in what particular way it will affect the patient? A. You mean as to what symptoms will be produced?

"Q. No; I mean as to how it will affect the physical man, the body? A. This condition that we call hysteria can affect the body in many ways. You can't state beforehand which way the body will be affected.

"Q. Nor can you state beforehand as to whether it will ultimately affect the man to a considerable extent? A. No, you cannot.

"Q. Doctor, as a general proposition, what is the prognosis with respect to cases of traumatic neurosis? A. There are cases that are always more or less chronic; cases in which the symptoms will last always—for a considerable length of time—and usually the patient will be really incapacitated and the disease will be present for a considerable length of time after the acute symptoms have disappeared. A patient will be more vulnerable to future injuries for a number of months, probably for a number of years, after the injury.

"Q. Now, doctor, what would you say of a case in which the patient in two or three weeks after the injury was unable to recollect clearly, would tear his clothing and use obscene language that he hadn't been accustomed to using before, and after that had been treated by this suggestive treatment, and this impedi-

ment of his speech disappeared, and he is able to recollect clearly, he had stopped tearing his clothing, stopped the use of obscene or vulgar language that he had been using prior to that time, and before he had been unable to walk, and staggered across the floor, that symptom had also practically entirely disappeared, so much at least, that he could walk about in the yard, was a boy twelve years old, otherwise in a healthly condition, what would you say about the probability of his recovery? A. I would say that the fact that those symptoms did disappear under suggestion in the way that they did would confirm my opinion of its being hysterical.

"Q.  Purely hysterical?  A.  Well, the symptoms that were influenced by the suggestion were hysterical; that the relief of these symptoms was merely a symptom relief; that the disease producing the symptom was probably not by any means entirely relieved at the time; that these same symptoms were relieved, and the question of how the individual would get along in the future would depend largely on how much latent hysteria was remaining in the system; how much of a latent tendency there was for it to again manifest itself later, and just how much, it is impossible for me to say."

Defendant put upon the stand Dr. Frank Fry, the nerve specialist of Washington University, and the specialist to whom the child was first taken for examination.  He testified that the symptoms exhibited by the boy were purely hysterical.

J. P. Slough, claim agent for the defendant, testified that when the company first learned of the alleged accident he went to 1814 Olive street to get some information in regard to the alleged accident. Mrs. Troutman, the mother of Mr. Allen, told him that her son carried Floyd Fisher from the pavement where he was hurt into the house.  Then counsel offered to show by this witness that he had been to Mrs. Troutman's home on three different occasions to see her son and that

Mrs. Troutman told him that the son was not in the house, when, as a matter of fact, he was there at the time. The court excluded this offer and the defendant duly saved its exception.

Defendant then showed that between the hours of six and seven p. m., at the time of the alleged accident, there were only twenty-seven cars of the class described by plaintiff as the kind of car upon which he was stealing a ride over the Olive street line. Defendant then put on the stand twenty-one of the conductors who had charge of these cars, all of whom stated that they passed the point of the alleged accident between the hours alleged of the date of the accident and no one of them had kicked a boy off the car or knew anything of the alleged accident.

The affidavit of the missing conductors, six in number, who passed that point within the limits of the time when the accident is said to have occurred, were read as depositions by consent and they testified similarly to the twenty-one conductors placed on the stand, showing the respective cars they were on, the number of their badges, time at which they passed the point in controversy and that none of them kicked a boy from the car at or about the time in question and that none of them knew anything in regard to the accident.

Over the objections and exceptions of defendant, the court instructed the jury as follows:

"1. The court instructs the jury that if they believe from the evidence that on or about the 9th day of January, 1902, and at or near the intersection of Twentieth and Olive streets in the city of St. Louis, the plaintiff placed himself upon the steps of one of the cars of the defendant company, and there stood after the car was put in motion; and if the jury further believe from the evidence that a conductor in the defendant's employ, and in charge of said car at the time, while acting in the performance of his duties as such, ejected and removed plaintiff from the steps of said car

by willfully and intentionally kicking him off of same whilst the car was in rapid motion, and, by so doing caused plaintiff to fall upon the granite pavement and to receive, as the direct result of such ejection, removal and fall, the injuries of which he complains, then the defendant is liable in this action, notwithstanding the jury may further find from the evidence that plaintiff was at the time a trespasser upon the car of the defendant company, and your verdict should be for the plaintiff.

"2. If the jury believe from the evidence that, under the rules of the defendant company, conductors in its employ are placed in charge of the cars to which they are respectively assigned, then the jury may find that it lies within the scope of the employment of such conductors to remove trespassers from the cars over which they (the said conductors) are given charge.

"3. The jury are instructed that if they find from the evidence that plaintiff was, at the time in question, upon a car of the defendant company without right, and therefore as a trespasser, yet, if they believe and so find from the evidence that a conductor in defendant's employ, and in charge of the car at the time, whilst acting in the course of his employment, kicked plaintiff from said car while same was in rapid motion, and plaintiff received as the direct result thereof the injuries of which he complains, then their verdict should be for plaintiff.

"8. The court instructs the jury that, if they find for the plaintiff, they shall assess his damages in such sum, not to exceed $20,000, as they may believe from the evidence will fairly compensate him for the injuries sustained, and in determining such amount they may take into consideration the physical condition plaintiff was in before the injuries in question, the physical pain and mental anguish, if any, he has suffered as the result of said injuries, and also the physical pain and mental anguish, if any, that they may believe from the evi-

dence he will suffer in the future in consequence of said injuries; and, in addition to this, they may also consider to what extent, if any, plaintiff's capacity for earning a livelihood, after his majority, will be impaired by said injuries.''

The defendant, upon its part, prayed the court to instruct the jury as follows, to-wit:

''4. If the jury find from the evidence that the plaintiff was not kicked, shoved or knocked from defendant's car by a conductor in charge of same, then your verdict will be for defendant.

''5. The jury are instructed that the burden is upon the plaintiff to prove by the greater weight of the evidence in the case that one of defendant's conductors, in charge of one of defendant's cars, forcibly kicked plaintiff from such car or the steps thereof.

''*And if from all the evidence in this case the jury are unable to determine from the evidence whether the plaintiff was so forced from said car by the said conductor, or whether he attempted to jump from said car, or fell from the same while riding on the steps of said car; or if the jury are unable to determine from all the evidence in the case what caused plaintiff to fall from said car, if you find from the evidence that he did so fall, then plaintiff cannot recover in this action, and your verdict will be for the defendant.*

''6. The jury are instructed that you are the sole judge of the credibility of witnesses and the weight to be given to their testimony, and if you believe and find from the evidence in this case that any witness has wilfully sworn falsely to any material fact in issue, then the jury are at liberty to disregard and may disregard the whole or any part of said witness's testimony.

''7. In determining the weight to be given to the testimony of any witness, the jury may take into consideration his demeanor and conduct while on the witness stand, the interest, if any, he may have in the re-

sult of the trial, together with all the other facts and circumstances in evidence.''.

Which said instructions numbered 4, 6 and 7, prayed by defendant, the court gave to the jury. And said instruction, prayed by the defendant, numbered 5, the court gave to the jury after striking out all the italicised portion, or all after the first sentence, to which action and ruling of the court, in so modifying said instruction and in refusing the same as asked, the defendant, by counsel, duly excepted at the time.

Defendant also prayed the court to give to the jury the following instructions:

''11. If from all the evidence in the case the jury are unable to determine whether the plaintiff fell from defendant's car or whether he was kicked or forced from said car, then your verdict will be for defendant, even though you may find that plaintiff was injured as a result of falling from said car upon the payment.

''12. The plaintiff by his petition demands twenty thousand dollars as compensatory damages for injuries alleged to have been sustained by him from both his fall from the car and from diptheria alleged to have been subsequently contracted by him while an inmate of a hospital. For damages, if any, resulting to plaintiff from diptheria, defendant is not liable, neither can defendant be held responsible for the combined consequences or damages, if any, resulting from both the fall from the car and the disease.

''This being true, and there being nothing in plaintiff's petition to indicate what portion of the sum sued for is demanded as compensation for alleged injuries resulting from his fall from the car, your verdict, if you find for plaintiff, can only be for nominal damages.''

Said above instructions numbered 11 and 12, prayed for by defendant, the court refused to give to the jury; to which refusal of the instructions thus

prayed the defendant, by counsel, duly excepted at the time.

Defendant contends that its objection to the introduction of any evidence under plaintiff's petition should have been sustained because it alleges, first, injuries resulting from the fall from the car, and, second, infection in the hospital.

It is true that no specific amount of damages is alleged as resulting from the fall from the car; nor was it necessary, for such damages are what is termed in the books general damages. It is also true that no specific amount of damages is alleged as resulting from the infection in the hospital, the damages claimed being for the combined consequences of the fall from the car and the infection in the hospital. But it is only when a petition fails to state a cause of action that an objection to the introduction of evidence under it can successfully be interposed. Even though several different causes of action be improperly united in the same count of the petition, this would be no ground for refusing to allow the introduction of evidence under it. The test in such cases is, does the petition state a cause of action? and, if it does, evidence may be introduced in support of it. Nor does it make any difference that there may be united in the same count matter which does not constitute a cause of action with facts and allegations which do, for if they be divisible, a demurrer to the introduction of evidence would only be available as to the matter which fails to constitute a cause of action, and should be special as to the defective matter, instead of being general as in this case.

"Where the matter in a single count is divisible in its nature, the demurrer should be confined to those parts which are defective, as the same general rule which applies to different counts applies also to the divisible matter in the same count constituting different causes of action; and where one count, containing distinct averments, discloses a good cause of action

in one of such averments, as when several breaches are assigned, some well and others ill, a general demurrer will be overruled." [6 Ency. Pl. and Pr., 303-4.]

The same rule is announced by practically all of the authorities. [Robrecht v. Marling, 29 W. Va. 765; Railroad v. Hardin, 107 Ga. 379.]

In Packard v. Slack, 32 Vt. 9, plaintiff, in addition to a claim for general damages for fraud in the sale of sheep to him, claimed special damages for diseases communicated to other sheep which he owned, among which the purchased sheep were placed. Upon the trial, defendant objected to the claim for special damages upon the ground that the petition, as to such damages, did not allege facts sufficient to constitute a cause of action against him. The court said: "If the special damages are not of a character that the plaintiff is legally entitled to recover, either because they are too remote, or because they are not sufficiently set out in the declaration, it will not be intended after verdict that the plaintiff was allowed to recover them. If the plaintiff attempts to recover for such special damages at the trial, the proper mode of raising the question is to object to the admissibility of the evidence, or to the instructions to the jury, or both. It has never been supposed that when under a declaration the plaintiff would be entitled to general damages, such declaration was made defective even on demurrer by alleging special damages, even where they were confessedly such as the party could not recover."

The allegation in the petition with respect to the diphtheria contracted by plaintiff at the hospital is simply one among other allegations in the petition, and might have been stricken out upon motion, or reached by special demurrer, but not by general objection to the introduction of evidence under the petition, which stated a cause of action.

It is claimed that instruction numbered three, given at the instance of plaintiff, is erroneous in that

it authorizes the jury to find that all injuries "of which he complains" are the direct result of his fall from the car. This instruction appears to us to be clearly erroneous, in that it submits to the jury, for their determination, the injury which plaintiff *claimed* to be the direct result of his being kicked from the car while it was in motion, without telling the jury what the issues were. This should have been done by this or some other instruction. As it was, the jury were left to form their own conclusions as to the injuries of which plaintiff complained, which, according to the allegations of the petition, embraced injuries for which the defendant could not be held liable. [Clark v. People's Collateral Loan Co., 46 Mo. App. 248; Cocker v. Cocker, 2 Mo. App. 451; Fleischmann v. Miller, 38 Mo. App. 177; Clark v. Fairley, 30 Mo. App. 335; 2 Thompson on Trials, sec. 2314.] Plaintiff, however, relies on Edelmann v. Transfer Co., 3 Mo. App. 503, and Brown v. Railroad, 104 Mo. App. 691, as holding to the contrary. The instructions in the first-named case used the words, "as alleged in the petition," and "by the means and manner charged in the petition." The court said: "The appellant contends that there was error in giving the first instruction for the respondent, as it refers to the jury the question what the issues are. If this were so, it would render the instruction bad, as it is the duty of the court to sift the pleadings and state what the issues are. But it is evident that in the present case the jury are not referred to the pleadings to find the issues. The reference, evidently made for the purpose of shortening the instruction, is to matters of description which are parts of the narrative, and not to the essential questions in the case, which are apparent from the instructions. As a matter of practice, however, it is better, in instructions, to avoid references to the pleadings, as the line is sometimes nar-

row which separates mere matters of description from issuable facts.''

In the case at bar the issues were sharply presented by the petition and answer, and instead of telling the jury what the issues were the instruction told them that ''if plaintiff received as the direct result thereof the injuries of which he complains,'' thus authorizing the jury, if so inclined, to take into consideration the injuries claimed to have been sustained by plaintiff by reason of his attack of diphtheria, with respect to which there was much evidence; and that they did so would seem to be indicated by the large amount of the verdict.

Brown v. Railroad, supra, simply holds that reference in an instruction to the pleadings, where the facts necessary to be found are fully told in other instructions, will not warrant a reversal of a judgment. Neither of these cases is in conflict with what we have said.

Plaintiff's instruction numbered eight is assailed upon the ground that it assumes, and permits the jury to assume, that injuries resulting from infection in the hospital were the direct result of the fall from the car. But when this instruction is given a fair and reasonable construction, it is not subject to the criticism urged against it. If it is too broad, as seems to be intimated by defendant, in that it embraces an item of damages not allowable, defendant should have asked an instruction restricting plaintiff's recovery to damages allowable.

In Taylor v. Iron Co., 133 Mo. 349, the court said: ''If defendant had desired an instruction negativing items of damages not allowable, out of a superabundance of caution, it was his duty to have asked it. Failing to do so at the trial of the cause, he should not now be heard to complain on appeal.''

In Geismann v. Electric Co., 173 Mo. 654, it is said: ''The defendant asked no instruction on the measure of damages whatever. No attempt was made by it to point

out the proper elements of damage in such cases, or to modify the general language of the instruction. The instruction is not erroneous in its general scope, and if, in the opinion of counsel for defendant, it was likely to be misunderstood by the jury, it was the duty of counsel to ask the modifications and explanations in an instruction embodying its views.''

Defendant also contends that the court erred in refusing defendant's instruction numbered 5, as asked, modifying it, and then giving it as modified, as well also as in refusing instruction numbered 11 asked by defendant, and embodying the same principles. It is only necessary to say with respect to these instructions that there was no evidence upon which to predicate the eleventh, nor the fifth as asked; so that there was no error in modifying, and giving as modified, the fifth instruction, nor in refusing to give the eleventh.

There was no error, we think, in refusing instruction numbered 12, asked by defendant. The first paragraph or clause in it presented, we think, the law correctly, but the last one did not; hence, there was no error in refusing the instruction as asked.

For the reasons given the judgment should be reversed, and the cause remanded. It is so ordered.

All concur.